United States District Court
Middle District of Florida
Jacksonville Division

MICHELLE MURRY, AS NEXT FRIEND,
NATURAL GUARDIAN, AND PARENT OF
S.L.F., A MINOR,

    *Plaintiff,*

V.                                                    NO. 3:16-CV-48-J-PDB

COMMISSIONER OF SOCIAL SECURITY,

    *Defendant.*

---

### Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. § 1383(c)(3) to review a final decision of the Commissioner of the Social Security Administration ("SSA") denying Michelle Murray's[1] claim on behalf of her minor daughter, S.L.F., for supplemental security income.[2] She seeks reversal, Doc. 22; the Commissioner, affirmance, Doc. 23. This

---

[1]The case caption spells the plaintiff's surname as "Murry," and her counsel also uses that spelling. *See generally* Doc. 22. But the plaintiff's driver's license indicates her surname is "Murray." *See* Tr. 497. The Court uses the latter spelling.

[2]The SSA uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of their denial. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 416.1400–416.1406. If the claimant is dissatisfied with the initial determination, she may ask for reconsideration. 20 C.F.R. §§ 416.1407−416.1422. If she is dissatisfied with the reconsideration determination, she may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 416.1429−416.1443. If she is dissatisfied with the ALJ's decision, she may ask for review by the Appeals Council. 20 C.F.R. §§ 416.1467−416.1482. If the Appeals Council denies review, she may file an action in federal district court. 20 C.F.R. § 416.1481. Section 1383(c)(3), incorporating § 405(g), provides the basis for the court's jurisdiction.

order adopts the summaries of facts and law in the Administrative Law Judge's ("ALJ's") decision, Tr. 27–42, and in the parties' briefs, Docs. 22, 23.

## I. Issues

Murray presents two issues: (1) whether the ALJ properly evaluated the opinions of Dr. Larry Neidigh, Ph.D., and school psychologist Susan Hatcher concerning S.L.F.'s IQ; and (2) whether substantial evidence supports the ALJ's finding S.L.F. has a less-than-marked limitation in maintaining concentration, persistence, or pace.[3] Doc. 22 at 7–10.

## II. Background

S.L.F. was born on February 6, 2003, and was a school-age child at all relevant times. Tr. 153; *see* 20 C.F.R. § 416.926a(g)(2) (defining a school-age child as "age 6 to attainment of age 12"). Murray applied for supplemental security income on S.L.F.'s behalf in April 2012 and alleged S.L.F. has been disabled since September 2011 due to lack of focus in school, poor memory, and a learning disability.[4] Tr. 153, 175. She

---

[3]The ALJ's finding of less-than-marked limitations in concentration, persistence, or pace relates only to his determination that S.L.F. does not have an impairment or combination of impairments that meets or medically equals a listing. *See* Tr. 30–31. Although Murray uses that terminology, she appears to challenge the ALJ's finding that S.L.F. has a less-than-marked limitation in attending and completing tasks, which relates to his determination that her impairments do not functionally equal a listing. *See* Doc. 22 at 9–10 (arguing the evidence supports that S.L.F. has a marked limitation in maintaining concentration, persistence, and pace and therefore "qualifies for disability in that the substantial evidence indicates she has marked restrictions as to two domains"). Because both findings relate to S.L.F.'s ability to concentrate and persist in tasks, the evidence relevant to those findings—and the Court's evaluation of the ALJ's decision as to both issues—is the same. For simplicity, the Court will refer only to the ALJ's finding as to S.L.F.'s ability to attend and complete tasks.

[4]The pertinent time period is the application date. *See* 20 C.F.R. §§ 416.330, 416.335.

proceeded through the administrative process, failing at each level. Tr. 1–5, 24–47, 73–98, 101–07. This case followed. Docs. 1, 14.

## III. Opinion Evidence

In February 2013, Ms. Hatcher conducted a psychoeducational evaluation of S.L.F. due to her "academic and attentional difficulties presented in the regular education classroom." Tr. 353. As part of the evaluation, Ms. Hatcher administered the Wechsler Intelligence Scale for Children–Fourth Edition ("WISC-IV"), an IQ test that "measures general thinking ability and reasoning skills of children in four primary areas: verbal comprehension, perceptual reasoning, working memory, and processing speed." Tr. 355. The test also includes a full-scale IQ "providing a global indication of the child's overall intellectual functioning." Tr. 355. She stated S.L.F. scored 73 in verbal comprehension, 79 in perceptual reasoning, 74 in working memory, 91 in processing speed, and had a full-scale IQ of 73. Tr. 355. The processing-speed score was within the average range; all others were within the "borderline range." Tr. 355. Ms. Hatcher stated, "No behaviors that may have hindered performance [during test sessions] were noted. The results are considered to be an accurate reflection of [S.L.F.'s] current functioning." Tr. 355. Ms. Hatcher also administered testing to assess S.L.F.'s academic functioning. Tr. 355–56. She concluded S.L.F.'s performance on that testing "indicated that [r]eading and [m]ath skills are within the range of expectations when compared with intellectual functioning." Tr. 357.

In March 2014, Dr. Neidigh reviewed results of a WISC-IV test administered by Mark Flynn, Psy.D. Tr. 519. The results showed S.L.F. scored 75 in verbal comprehension, 65 in perceptual reasoning, 77 in working memory, 68 in processing speed, and had a full-scale IQ of 64. Tr. 520. He stated "[t]he current data indicates that [S.L.F.] functions in the [m]ildly [i]ntellectually [d]isabled [r]ange of [i]ntellectual functioning" and "reflects severe underachievement in multiple areas." Tr. 524. He provided a "provisional diagnosis of [m]ild [m]ental [r]etardation." Tr.

524. On April 10, 2014, after Murray completed a form documenting "significant deficits in adaptive behavior," Dr. Neidigh confirmed his diagnosis. Tr. 566–69.

## IV. Hearing Testimony

At an April 2014 hearing, Murray testified as follows. S.L.F. is in the fourth grade and had to repeat that grade. Tr. 54. Her grades are "not too good," and teachers have discussed holding her back again. Tr. 54. She struggles primarily with math and reading. Tr. 55. After the school evaluated her IQ as borderline, Murray took her to a doctor for another evaluation, which produced test results indicating mild mental retardation. Tr. 55–56. Her teachers report she does not focus in class and is easily distracted. Tr. 56.

S.L.F. has tried two medications to manage symptoms. Tr. 56. She did not do well on the first but has been "doing a little better" with the second. Tr. 56–57. She relates to other children well and has no trouble with teachers. Tr. 57. She gets along well with most of her siblings but is sometimes aggravated by her 14-year-old brother. Tr. 60.

Murray assigns chores, but S.L.F. does not always do them. Tr. 58. S.L.F. does not like bathing herself and has trouble putting together appropriate outfits. Tr. 58. She has no problem with eating and can microwave food and make sandwiches. Tr. 58–59. She helps take care of two rabbits. Tr. 59. She enjoys playing with dolls, going out to eat, skating, watching television, going to the park, drawing, and bicycling. Tr. 59–60, 65. She tries to read books but struggles. Tr. 60. She occasionally uses a computer at school or her grandmother's house for learning programs. Tr. 61. She has no sleep problem. Tr. 65. She receives one-on-one help from her math and reading teachers. Tr. 62. She mostly reads nonfiction books. Tr. 62–63. She was evaluated for an individualized education program ("IEP"). Tr. 66.

## V.     ALJ's Decision

At step one,[5] the ALJ found S.L.F. has not engaged in substantial gainful activity since April 2012 (when Murray filed the application). Tr. 30.

At step two, the ALJ found S.L.F. suffers from severe impairments of attention deficit hyperactivity disorder ("ADHD") and borderline intellectual functioning. Tr. 30.

At step three,[6] the ALJ found S.L.F. has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 30–32. He particularly considered listings 112.05 (intellectual disability) and 112.11 (ADHD). Tr. 30–32.

The ALJ also found at step three that S.L.F. does not have an impairment or combination of impairments that functionally equals the severity of a listing. Tr. 32. He found she has a marked limitation in acquiring and using information; less-than-marked limitations in attending and completing tasks and ability to care for herself;

---

[5] An ALJ must follow a three-step sequential process to determine if a minor is disabled. 20 C.F.R. § 416.924(a). The ALJ asks: (1) is the minor currently engaged in substantial gainful activity; (2) does she have a severe impairment or combination of impairments; and (3) does the impairment meet, medically equal, or functionally equal the severity of the specified impairments in the listings. *Id.*

[6] At step three, an ALJ must determine whether a minor claimant's impairments meet, medically equal, or functionally equal the listings. 20 C.F.R. § 416.924(a). In determining functional equivalency, an ALJ assesses the "degree to which the [claimant's] limitations interfere with the [claimant's] normal life activities." *Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1279 (11th Cir. 2004). The ALJ must consider six "major domains of life": (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *Id.*; 20 C.F.R. § 416.926a(b)(1). An impairment functionally equals the listings if it causes marked limitations in two domains or an extreme limitation in one domain. *Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(d).

and no limitation in interacting and relating with others, moving about and manipulating objects, and health and physical well-being. Tr. 36–42.

Based on those findings, the ALJ found S.L.F. has not been disabled since April 2012. Tr. 42.

## VI. Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.*

## VII. Analysis

### A.   *Whether the ALJ Properly Evaluated Medical-Opinion Evidence*

Murray argues the ALJ did not provide good reasons for giving little weight to the IQ scores in Dr. Neidigh's report and great weight to the IQ scores in Ms. Hatcher's evaluation. Doc. 22 at 7–9. She argues the ALJ rejected Dr. Neidigh's opinions based solely on the absence of a "validity statement" in his report, but he "offered no expert opinions or other record evidence that such a finding is required in deeming the subject report to be reliable and substantial." Doc. 22 at 7–8. She argues the ALJ should not have given great weight to Ms. Hatcher's opinion because she was less qualified than Dr. Neidigh, her opinions predated Dr. Neidigh's, her opinions also lacked a validity statement, and the ALJ made no effort to reconcile the two opinions. Doc. 22 at 8–9.

The Commissioner responds the ALJ properly weighed Dr. Neidigh's and Ms. Hatcher's opinions because Ms. Hatcher's report effectively included a validity

statement, other evidence supported her evaluation, Dr. Neidigh did not examine S.L.F. or assess the validity of the IQ test results on which he based his report, the ALJ properly rejected the limitations Murray had reported to Dr. Neidigh, Ms. Hatcher qualifies as an acceptable medical source, and her test results are sufficiently current. Doc. 23 at 6–12.

An ALJ must consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. § 416.927(c). He "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).

The opinions concerning S.L.F.'s IQ test results related to whether she had an impairment or combination of impairments that met or medically equaled listing 112.05. The regulations at the time of the ALJ's decision defined that listing as "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning." 20 C.F.R. Part 404, Subpart P, App'x 1 § 112.05 (eff. Feb. 26, 2014).[7] A claimant met the required severity if she had "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function" or "a valid verbal, performance, or full scale IQ of 60 through 70" and a marked impairment in age-appropriate social functioning, a marked impairment in age-appropriate

---

[7]The SSA substantially revised the mental-disorders listings on September 26, 2016, effective January 17, 2017. *See* Soc. Sec. Admin., *Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138-1 (Sept. 26, 2016). Because the ALJ issued his decision on June 20, 2014, the listings in effect at that time apply. *See id.* at 66138 n.1 (stating that the SSA would "use the[ ] final rules on or after their effective date, in any case in which we make a determination or decision. We expect that [f]ederal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."). All citations to the listings in this order refer to the version that took effect on February 26, 2014, and remained in effect until December 8, 2014.

personal functioning, or marked difficulties in maintaining concentration, persistence, or pace. *Id.* § 112.05D, E.

A test is valid if it "measures what it is supposed to measure." *Id.* § 112.00D8. "In considering the validity of a test result, [the SSA] should note and resolve any discrepancies between formal test results and the child's customary behavior and daily activities." *Id.* The adult listings stated that "the narrative report that accompanies [standardized intelligence] test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* § 12.00D6.

The absence of a validity statement in Dr. Neidigh's opinion provided good cause to give it little weight. Although the child disability listings did not expressly require a validity statement in the narrative report accompanying IQ test results, Murray has presented no reason why the absence of such a statement cannot be a basis for rejecting an evaluator's test results in favor of results with validity findings. IQ test results used with both the adult and child listings for intellectual disability had to be "valid." *See* 20 C.F.R. Part 404, Subpart P, App'x 1 §§ 12.05, 112.05. The child listings required the SSA to resolve discrepancies between test results and the child's functioning in considering the validity of the results. *Id.* § 112.00D8. It follows that an opinion is less persuasive if it contains no indication of whether the evaluator considered the results valid. That is especially true here because Dr. Neidigh did not administer the IQ test underlying his opinions but instead interpreted results provided by someone else. *See* Tr. 519. His report contains no indication that he personally evaluated or even interacted with S.L.F. *See* Tr. 519–24. The report appears to be based on an assumption that the results are valid.

Ms. Hatcher's inconsistent test results also provided good cause for rejecting the results Dr. Neidigh reported. The ALJ gave great weight to Ms. Hatcher's test results because they were "considered an accurate reflection of [S.L.F.'s] current functioning." Tr. 31. Ms. Hatcher's report, although not containing the word "valid,"

8

included her observations of S.L.F. in a classroom setting and her opinion that the IQ test results were consistent with S.L.F.'s observed academic performance and functioning. *See* Tr. 355–57. Ms. Hatcher's report suggests she administered the test herself. *See generally* Tr. 353–58. Under those circumstances, the ALJ did not err in crediting the test results Ms. Hatcher obtained over those Dr. Neidigh discussed.

Murray's argument that Dr. Neidigh was better qualified than Ms. Hatcher is unavailing because, degrees and titles aside, Ms. Hatcher—a school psychologist—was an acceptable medical source under the regulations. *See* 20 C.F.R. § 416.913(a)(2) ("Acceptable medical sources are … [l]icensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing intellectual disability, learning disabilities, and borderline intellectual functioning only."). And Murray's argument that Ms. Hatcher's evaluation predated Dr. Neidigh's fails because Ms. Hatcher's test results were current as of the date of the ALJ's decision. *See* 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00D10 ("IQ test results obtained between ages 7 and 16 should be considered current … for 2 years when the IQ is 40 or above.").

B.  ***Whether Substantial Evidence Supports the ALJ's Finding that S.L.F. Has a Less-Than-Marked Limitation in Attending and Completing Tasks***

Murray argues substantial evidence does not support the ALJ's finding that S.L.F. has a less-than-marked limitation in attending and completing tasks. Doc. 22 at 9–10. She points to (1) evidence that providers had diagnosed S.L.F. with ADHD and assigned global assessment of functioning ("GAF") scale ratings in the 40s and (2) an IEP indicating S.L.F. "had difficulties with regard to concentration and completing tasks in a timely fashion." Doc. 22 at 9–10.

The Commissioner responds substantial evidence supports the ALJ's finding because Ms. Hatcher observed S.L.F. had shown adequate persistence and sustained attentiveness, medical records demonstrate her symptoms improved on medication,

9

Murray is essentially asking the Court to reweigh the evidence, and, in any event, the evidence she cites does not change that the ALJ relied on substantial evidence. Doc. 23 at 12–15.

In determining whether a minor has an impairment or combination of impairments that functionally equals the severity of the listings, a claimant has a marked limitation when her "impairment(s) interferes seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'"[8] Id.

In finding S.L.F. has a less-than-marked limitation in attending and completing tasks, the ALJ discussed her diagnosis of attention deficit disorder ("ADD")[9] and a teacher's November 2012 opinion she "has problems attending and completing tasks." Tr. 37–38, 200. He observed she had started taking medication to manage her symptoms in October 2012, and medical records indicate she responded "very well" to it. Tr. 38. He also acknowledged the various GAF scale ratings S.L.F. had received but gave them little weight because, as a "snapshot," they are "of limited use in assessing the severity of a mental impairment" and "do not provide a reliable

---

[8] Section 416.926a(e)(2) also states the SSA considers a minor to have a marked limitation (1) if she is under 3, has "no standard scores from standardized tests in [her] case record," and functions "at a level that is more than one-half but less than two-thirds of [her] chronological age"; (2) if she has "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [her] day-to-day functioning in domain-related activities is consistent with that score"; or, (3) with respect to health and physical well-being, if she is "frequently ill because of [her] impairment(s) or ha[s] frequent exacerbations of [her] impairment(s) that result in significant, documented symptoms or signs." 20 C.F.R. § 416.926a(e)(2)(ii)–(iv).

[9] Medical records conflict on whether S.L.F. has ADD or ADHD. See, e.g., Tr. 436, 452, 467, 519, 539, 547, 554, 561. Murray does not contend the distinction is material and focuses only on evidence of S.L.F.'s inattentiveness. See generally Doc. 22.

longitudinal picture of the claimant's mental functioning." Tr. 35. He also observed treatment notes indicate she manages symptoms with medication. Tr. 35.

Substantial evidence supports the ALJ's finding concerning S.L.F.'s ability to attend and complete tasks. Medical records indicate that, in August 2012, Dr. Marian Levai prescribed Concerta to treat S.L.F.'s ADD, Tr. 452; in November 2012, Dr. Umesh Mhatre observed she had "responded very well" to it, Tr. 467; in January 2013, he repeated that observation and noted Murray had reported the current dose was adequate, Tr. 550; and in March 2013, he observed she tolerated the medication well, her grades had improved, she was better focused and "not as impulsive," and she showed "fairly well[-]controlled hyperactivity and impulsivity," Tr. 547. The GAF scale ratings in the 40s Murray cites were from before S.L.F. had started taking medication. *See* Tr. 437, 452. The ALJ correctly observed that GAF scale ratings are of limited use in determining the severity of a mental impairment and do not provide a reliable longitudinal picture of a claimant's mental functioning.[10] Her citation of

---

[10]The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." Manual at 32–34. The latest edition of the Manual has abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). Even before that abandonment, "the Commissioner … declined to endorse the GAF scale for use in the Social Security and SSI disability programs, and … indicated that GAF scores have no direct correlation to the severity requirements of the mental disorders listings." *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (internal quotations omitted) (citing 60 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)).

In July 2013, the SSA issued Administrative Message (AM)-13066, providing its adjudicators, including ALJs, with internal guidance regarding the interpretation of GAF rating. Soc. Sec. Admin., Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM–13066 (July 22, 2013) REV (Oct. 14, 2014). AM-13066 acknowledged DSM-5 eliminated the use of GAF but confirmed that adjudicators will continue to consider GAF scores as opinion evidence. As with other opinion evidence, however, a GAF needs supporting evidence to be given much weight. *Id.* According to AM-13066, "the extent to which an adjudicator can rely on the GAF rating as a

11

evidence tending to support that S.L.F. had some difficulties with concentration does not change that substantial evidence supports the ALJ's finding. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) ("Even if the evidence preponderates against the … factual findings, we must affirm if the decision reached is supported by substantial evidence.").

## VIII. Conclusion

The Court **affirms** the Commissioner's decision denying Murray's claim on S.L.F.'s behalf and directs the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on March 7, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:  Counsel of record

---

measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." *Id.* The SSA cautions that a "GAF score is never dispositive of impairment severity," and an ALJ should "not give controlling weight to a GAF from a treating source unless it is well[-]supported and not inconsistent with the other evidence." *Id.* AM-13066 explains that because a GAF rating is only a "snapshot," it "does not provide a reliable longitudinal picture of the claimant's functioning for a disability analysis" unless the clinician "clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies." *Id.* § E.